WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Beatrice Mendenhall,                    )    No. CV 10-586-TUC-HCE
                                        )
          Plaintiff,                    )    **ORDER**
                                        )
vs.                                     )
                                        )
                                        )
Michael J. Astrue, Commissioner of the )
Social Security Administration,         )
                                        )
          Defendant.                    )
                                        )
_____ )

Plaintiff has filed the instant *pro se* action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent. *See* 28 U.S.C. § 636(c).

Pending before the Court are Plaintiff's Opening Brief (Doc. 15) (hereinafter "Plaintiff's Brief"), Defendant's Opposition to Plaintiff's Opening Brief (Doc. 19) (hereinafter "Defendant's Brief"), and Plaintiff's Reply Brief (Doc. 20) (hereinafter "Reply").  For the following reasons, the Court remands this matter for further proceedings.

I.    PROCEDURAL HISTORY

"In a hearing decision dated August 24, 2000 and based on an application filed on August 24, 1998, [Plaintiff] was found disabled and eligible for supplemental security income benefits.  Her eligibility for such benefits was subsequently terminated when she was incarcerated for transporting illegal immigrants." (TR. 14; *see also* Plaintiff's Brief, p. 1

1   (Plaintiff's "benefits were suspended..." when she was incarcerated in 2004)).  Plaintiff was

2   released from prison in July 2005.  (TR. 14; Plaintiff's Brief, p.1).

3         In August 2005, Plaintiff protectively filed with the Social Security Administration

4   (hereinafter "SSA") an application for supplemental social security income under Title XVI

5   of the Social Security Act, 42 U.S.C. §§ 1381-83c, which is the subject of the instant action.

6   (TR. 96-98).    Plaintiff alleges inability to work since August 30, 1986 due to chronic

7   headaches, carpal tunnel syndrome, and nerve damage in her neck and back.  (TR. 96, 125-

8   126).  Plaintiff's application was denied initially and on reconsideration. (TR. 73-76, 79-81).

9         The matter proceeded to hearing before Administrate Law Judge Lauren Mathon

10   (hereinafter "ALJ").  (TR. 410-435).  At the hearing, Plaintiff appeared without counsel.

11   (*Id.*).    Plaintiff and two of her daughters testified.  (*Id.*). Thereafter, the ALJ issued a

12   decision denying Plaintiff's claim.  (TR. 51-62).  Plaintiff appealed the decision.  (*See* TR.

13   68).  On June 28, 2008, the Appeals Council vacated the ALJ's decision and remanded the

14   matter to the ALJ for consideration of additional evidence in the form of an April 17, 2007

15   letter, development of the record to obtain additional evidence concerning Plaintiff's back

16   impairment, and   consideration of testimony from a vocational expert.  (TR. 68-69).

17         The remanded matter came on for hearing on September 15, 2008.  (TR. 436-466).

18   Plaintiff appeared without counsel.  (*Id.*).  Plaintiff, two of Plaintiff's daughters, and

19   vocational expert, Ms. Kathleen McAlpine (hereinafter "VE), testified.  (*Id.*).  On March 30,

20   2009, the ALJ issued a decision denying Plaintiff's claim.  (TR. 14-26).  Plaintiff appealed,

21   and on August 4, 2010, the Appeals Council denied Plaintiff's request for review thereby

22   rendering the ALJ's March 30, 2009 decision the final decision of the Commission. (TR. 6-

23   8). Plaintiff then initiated the instant action.

24   II.     STANDARD OF REVIEW

25         An individual is entitled to disability insurance benefits if he or she meets certain

26   eligibility requirements and demonstrates the inability to engage in any substantial gainful

27   activity by reason of any medically determinable physical or mental impairment which can

28   be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than twelve months. 42 U.S.C. §§ 423, 1382. "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'" *Penny v. Sullivan,* 2 F.3d 953, 955 (9th Cir. 1993)(*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers v. Secretary,* 846 F.2d 573, 575-576 (9th Cir. 1988);*Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. *Id.* at 1156.

1        In evaluating evidence to determine whether a claimant is disabled, the opinions of

2 treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th

3 Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on

4 either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving

5 a conflict between the opinion of a treating physician and that of an examining or non-

6 examining physician, the opinion of the treating physician is entitled to greater weight and

7 may be rejected only on the basis of findings setting forth specific legitimate reasons based

8 on substantial evidence of record. *Id.* Moreover, the Commissioner may reject the treating

9 physician's uncontradicted opinion as long as the Commissioner sets forth clear and

10 convincing reasons for doing so. *Id.*

11        Further, when medical reports are inconclusive, questions of credibility and resolution

12 of conflicts in the testimony are functions solely of the Commissioner. *Id.* (citations

13 omitted). However, the Commissioner's finding that a claimant is less than credible must

14 have some support in the record. *See  Light v. Social Security Administration,* 119 F.3d 789

15 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

16 III.    THE ALJ'S FINDINGS

17       A.    Claim Evaluation

18        SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step

19 sequential process. 20 C.F.R. §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395

20 (9th Cir. 1991). The first step requires a determination of whether the claimant is engaged

21 in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, then the

22 claimant is not disabled under the Act and benefits are denied. *Id.* If the claimant is not

23 engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a

24 determination of whether the claimant has a medically severe impairment or combination of

25 impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c). In making a determination at step two,

26 the ALJ uses medical evidence to consider whether the claimant's impairment more than

27 minimally limited or restricted his or her physical or mental ability to do basic work

28 activities. *Id.* If the ALJ concludes that the impairment is not severe, the claim is denied.

*Id.* If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App.1. If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary. If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step. The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity (hereinafter "RFC")[1] to perform past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied. *Id.* However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(f). 416.920(f). At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines (hereinafter "grids") promulgated by the SSA. *Desrosiers*, 846 F.2d at 576-577. The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983). However, because the grids are based on exertional or strength factors, the grids do not apply where the claimant has significant nonexertional limitations. *Penny,* 2 F.3d at 958-959; *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). When the grids do not apply, the ALJ must use a vocational expert in making a determination at step five. *Desrosiers,* 846 F.2d at 580.

---

[1]RFC is defined as that which an individual can still do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945.

B.    The ALJ's Decision

In her March 30, 2009 decision, the ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since August 1, 2005, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: tendonitis; complaints of pain in her neck, back and shoulders; status post cervical laminectomy C3-C6 for multilevel cervical stenosis; status post carpal tunnel release on the left; and depression/bipolar disorder (20 CFR 416.921 *et seq.*).

    ***

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

    ***

4.    After careful consideration of the entire record, the undersigned finds that the Claimant retains the residual functional capacity to occasionally lift up to twenty pounds, frequently lift and/or carry up to ten pounds, stand and/or walk for six hours in an eight hour day and sit for six hours in an eight hour day. Additionally, claimant is limited to simple, repetitive tasks.

    ***

5.    The claimant has no past relevant work (20 CFR 416.965).

    ***

6.    The claimant was born on February 23, 1960 and was 45 years old, which is defined as a younger individual age 18-49,on the date the application was filed (20 CFR Part 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, 416.969a).

    ***

10.    The claimant has not been under a disability as defined in the Social Security Act since August 1, 2005, the date the application was filed. (20 CFR 416.920(g)).

### DECISION

Based on the application for supplemental security income protectively filed on August 1, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(TR. 16-26).

In reaching her decision, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her]...symptoms are not credible to the extent that they are inconsistent with the..." ALJ's RFC assessment. (TR. 22). When finding that Plaintiff "is capable of making a successful adjustment to other work..." that exists in significant numbers in the national economy, the ALJ based her opinion on testimony from the vocational expert that given Plaintiff's age, education, work experience, and residual functional capacity such

individual would be able to perform the requirements of representative occupations such as production assembler and bench assembler. The production assembler (DOT# 734.687-018) is a sedentary, unskilled occupation with 361,000 jobs in the national economy and 17,416 jobs in the Arizona economy. The bench assembler (DOT# 706.684-022) is a light, unskilled occupation with 324,000 jobs in [sic] national economy and 17,416 jobs in the Arizona economy.

(TR. 25).

### IV.    DISCUSSION

#### A.    Argument

Plaintiff asserts that the ALJ's decision is erroneous because her disabilities have not improved and she is in constant pain.

Defendant contends that Plaintiff's condition improved after she underwent a cervical laminectomy in 2007. According to Defendant, the ALJ's RFC assessment is supported by substantial evidence and the ALJ properly relied on the VE's testimony to determine that Plaintiff is not disabled.

1    B.    The ALJ's RFC Assessment

2    Defendant asserts that substantial evidence supports the ALJ's assessment of

3    Plaintiff's RFC. The ALJ determined that Plaintiff had the RFC to perform a wide range of

4    light work[2] limited by the requirement that the work involve simple, repetitive tasks. (TR.

5    21). When determining a claimant's RFC, the "ALJ must consider all relevant evidence

6    in the record including, *inter alia,* medical records, lay evidence, and 'the effects of

7    symptoms, including pain, that are reasonably attributed to a medically determinable

8    impairment.'" *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006) (*quoting* SSR

9    96-8p); *see also* SSR 96-8p ("The RFC assessment must include a discussion of why

10   reported symptom-related functional limitations and restrictions can or cannot reasonably be

11   accepted as consistent with the medical and other evidence....If the RFC assessment conflicts

12   with an opinion from a medical source, the [ALJ] must explain why the opinion was not

13   adopted.").

14          1.    Medical evidence

15   Defendant asserts that the ALJ, in arriving at Plaintiff's RFC assessment, reasonably

16   considered the medical evidence and Plaintiff's testimony.

17   The record reflects that prior to Plaintiff's imprisonment in 2004, she had carpel

18   tunnel surgery. (TR. 285 (2006 note indicating: "She had right carpal tunnel done five years

19   _____

20          [2]Under the pertinent regulation:
     Light work involves lifting no more than 20 pounds at a time with frequent

21   lifting or carrying of objects weighing up to 10 pounds. Even though the
     weight lifted may be very little, a job is in this category when it requires a

22   good deal of walking or standing, or when it involves sitting most of the time
     with some pushing and pulling of arm or leg controls. To be considered

23   capable of performing a full or wide range of light work, you must have the
     ability to do substantially all of these activities. If someone can do light work,

24   we determine that he or she can also do sedentary work, unless there are
     additional limiting factors such as loss of fine dexterity or inability to sit for

25   long periods of time.

26

27   20 C.F.R. §416.967(b).

28

ago.  She states that it didn't help much."); TR. 281 (2006 note indicating: "She had a left carpal release about 7 years ago.")).  Additionally, prior to entering prison, Plaintiff suffered from low back pain.  (TR. 281).  Prior to her imprisonment, Plaintiff took Vicodin for pain.  (*Id.*).  While in prison, she took Sulindac for pain.  (*Id.*).  After her release, she resumed taking Vicodin. (*Id.*; TR. 297).

In October 2004,  T. Knight, Physician's Assistant-Certified (hereinafter "PAC"), at the Health Services Unit at "FPC-PHX" indicated that Plaintiff was restricted to light duty work with no lifting greater than 15 pounds,  no standing for longer than 15 minutes, and no excessive bending.  (TR. 244).  The ALJ indicated that PAC Knight worked for CODAC Behavioral Health. (TR. 23). The ALJ found PAC Knight's opinion was " inconsistent with the weight of the medical evidence...." (*Id.*).  Plaintiff takes issue with the ALJ's treatment of PAC Knight's opinion because, according to Plaintiff, PAC  Knight worked for the prison, not for CODAC.  (Plaintiff's Brief, p.1).  The record reflects that Plaintiff was imprisoned in 2004.  (*See Id.*; TR 14; TR. 281 ("She was released in July 2005 after 11 months in prison....")).

A 2004 MRI of Plaintiff's cervical spine showed mild narrowing at "C5/6 and C6/7 discs with moderate anterior osteophytic spurring particularly off C/6." (TR. 173).  On July 27, 2004, Plaintiff was examined by Randy Soo Hoo, M.D., a state agency physician.  (TR. 168-172).  Plaintiff complained of chronic neck and back pain and "radicular symptoms to her shoulders and both arms.  She also complains of constant low back pain with  occasional radicular symptoms to her entire right leg[]" and noted that these symptoms become worse with standing and walking but are relieved with sitting. (TR. 169).  At times her symptoms are so severe that she must use a wheelchair.  (*Id.*; *see also* TR. 170 (noting that Plaintiff came to the appointment in a wheelchair)).  Plaintiff also complained of numbness in both hands, blindness in her left eye, and diminished hearing in her left ear.  (TR. 169).

Upon physical examination, Dr. Soo Hoo found signs "suggestive of an underlying pathology" regarding Plaintiff's neck and back pain.  (TR. 171).  He could not verify that Plaintiff suffered from carpel tunnel syndrome given negative testing results.  (*Id.*). Dr. Soo

Hoo noted "physical findings for a medial field defect on the left eye...." (*Id.*).  Findings

regarding Plaintiff's allegation of deafness in her left ear were "inconsistent." (*Id.*).  Dr. Soo

Hoo opined that Plaintiff could:

> Lift/carry 20 pounds occasionally and 10 pounds frequently.  Stand/walk at least four hours for an eight-hour workday.  Sit at least six hours for an eight-hour workday with usual opportunities for breaks.  She can climb stairs and ramps occasionally, never ladders, ropes and scaffolding.  There are no restrictions for balancing. She can occasionally stoop, crouch, kneel, and crawl.  There are no restrictions for reaching, handling, fingering, and feeling.  There may be restrictions for seeing given the visual field defect noted on the examination.  Although she alleges hearing deficiencies, none were noted on the examination and more formal testing should be initiated if this is pertinent to the administrative assessment of her disability allegation.  No restrictions are noted for speech.

(TR. 172).

Dr. Soo Hoo examined Plaintiff again in November 2005. (TR. 213-217). Plaintiff

stated that her symptoms had not significantly changed since Dr. Soo Hoo's 2004

examination, except that she now experienced radicular symptoms in her left leg and she

experienced difficulty with walking and standing for prolonged periods.  (TR. 214).

November 2005 x-rays reflected: deformity of the index finger on Plaintiff's right hand; mild

to moderate arthritic change in the lower cervical spine, most pronounced at the C6-C7 level;

mild degenerative disc disease of the lumbar spine, most severe at the L5-S1 level; and

negative findings for the thoracic spine. (TR. 219-222).  On physical examination, Plaintiff

had limited range of motion in her cervical spine.  (TR. 215).  Dr. Soo Hoo noted that

Plaintiff "has underlying radiographic findings suggestive of degenerative disease in the

cervical spine.   She complains of back pain and does have findings suggestive of

radiculopathy." (TR. 216).  Dr. Soo Hoo opined that Plaintiff could:

> Lift/carry occasionally 20 pounds and 10 pounds frequently.  Stand and walk at least four hours for an eight-hour workday.  Sit at least six hours for an eight-hour workday.  She can occasionally climb stairs, ramps and ladders, never  ropes or scaffolding. She can frequently balance.  Occasionally stoop, crouch, kneel and crawl.  No restrictions are noted for reaching, handling, fingering and feeling.  No restrictions are observed for hearing, seeing or speaking.

(*Id.*).

Also in November 2005, non-examining state agency physician Robert Hirsch, M.D.,

completed a Physical Functional Capacity Assessment wherein he indicated that Plaintiff could: occasionally lift up to 20 pounds; frequently lift up to 10 pounds; and stand and/or walk up to four hours and sit up to six hours in an eight-hour workday. (TR. 224). He also indicated that, other than the limitation on lifting and carrying, Plaintiff was unlimited in the ability to push or pull using hand or foot controls. (*Id.*). Dr. Hirsch further opined that Plaintiff could: frequently balance; occasionally kneel, stoop, crouch, crawl and climb ramps and stairs; and never climb ladders, ropes and scaffolds. (TR. 225). He indicated that Plaintiff should avoid concentrated exposure to hazards such as machinery and heights and found no manipulative, visual or other limitations. (TR. 226-227).

In February 2006, non-examining state agency physician Charles Fina completed a Physical Functional Capacity Assessment wherein he indicated that Plaintiff could: occasionally lift up to 20 pounds; frequently lift up to 10 pounds; and stand and/or walk and sit up to six hours in an eight-hour workday. (TR. 246; *see also* TR. 3). He further opined that other than the limitation on lifting and carrying, Plaintiff was unlimited in the ability to push or pull using hand or foot controls. (TR. 246). Dr. Fina also indicated that Plaintiff could: frequently balance, stoop, kneel, crouch, crawl and climb ramps and stairs; and occasionally climb ladders, ropes and scaffolds. (TR. 247). He found no manipulative, visual or other limitations. (TR. 248-249).

In April 2006, Kaidong Wang, M.D., Ph. D., saw Plaintiff upon referral from Plaintiff's treating physician, John Wadleigh, D.O., for complaints of low back pain. (TR. 281). Plaintiff reported to Dr. Wang that she felt pain radiating from her lower back down her legs, more to the left, and that standing made the pain worse. (*Id.*). Plaintiff also complained of numbness and tingling in her fingertips and of intermittent neck pain radiating down her arms. (*Id.*). Plaintiff came to the appointment "on her mother's scooter" because she felt weak. (*Id.*).

Dr. Wang performed a "NCS/EMB of both lower limbs, which revealed no evidence of significant neurologic changes to explain [Plaintiff's] low back pain." (TR. 282). Dr. Wang's assessment was "chronic low back pain.   There are no clinical or

1   electrophysiological signs of neurological deficits at this time." (*Id.*).   He recommended

2   continued use of Vicodin. (*Id.*).   He "found no reason not to believe [Plaintiff] based on

3   her...over one hour interview" with him. (*Id.*).

4          In October 2006, Plaintiff presented to the emergency room complaining of numbness

5   and tingling in her arms and left leg. (TR. 314, 318). CT scans of Plaintiff's brain were

6   normal and indicated no acute stroke. (TR. 320). Robert Duran, M.D., opined that Plaintiff's

7   "left leg symptoms may be related to her lumbar disc disease with compressive

8   radiculopathy.  Similar nerve compression could be occurring at the wrist in relationship to

9   her carpal tunnel syndrome and/or ulnar nerve contributing to the ulnar components of her

10  symptom." (TR. 319).  Plaintiff told Dr. Duran that she had previously seen a neurologist

11  and he recommended that she follow up with the neurologist. (*Id.*).

12         In November 2006, Plaintiff saw Joel R. Goode, M.D., upon referral from Dr.

13  Wadleigh, for bilateral elbow pain and locking and clicking of her left long finger. (TR. 285,

14  331).  On examination, Dr. Goode found that Plaintiff had full range of motion of all the

15  digits of both hands but that she had locking and clicking of the left long finger and was

16  "tender over the A1 pulley there.  She has pain over both elbows without instability or

17  swelling." (*Id.*).  Her grip strength was moderate and she had a positive wrist extension test,

18  greater on the right. (*Id.*).   Dr. Goode diagnosed "classic lateral epicondylitis and trigger

19  finger" and injected Plaintiff's finger and right elbow. (*Id.*).  Plaintiff rejected an injection

20  to her left elbow because "the first shot hurt too much." (*Id.*).  Dr. Goode planned to see

21  Plaintiff in four to six weeks for follow up. (*Id.*).

22         On January 8, 2007, Plaintiff saw neurologist Carol Henricks, M.D., on referral from

23  Dr. Wadleigh  (TR. 325).  Dr. Hendrick's impression was "cervicalgia, spasm, bilateral

24  cervical radicular symptoms and sensory-motor symptoms that are concerning for cervical

25  spinal cord pathology....It is most important to study her cervical spine before any further

26  treatments." (TR. 327).

27         January 25, 2007 MRIs of Plaintiff's cervical spine showed "[d]iffuse marked spinal

28  stenosis...with myelomalacia", "a marked degree of spinal canal narrowing associated with

1    degenerative dis[c] disease", and "[s]evere degenerative dis[c] disease of the cervical spine".

2    (TR. 328-329).    Upon review of the MRIs, Dr. Henricks noted "of most concern is

3    myelomalacia C5-6-7." (TR. 324).  Dr. Henricks prescribed Vicodin and made an "urgent

4    referral to Dr. Abbay Sanan neurosurgery for evaluation for patient [with] symptomatic

5    cervical spinal stenosis." (*Id.*).

6        In March 2007, Plaintiff saw neurosurgeon Abbay Sanan, M.D., upon referral from

7    Dr. Henricks.  Dr. Sanan noted that Plaintiff's January 2007 MRIs showed: "multi-level

8    spinal stenosis. She has myelomalacia behind C4-C5 and C5-C6. Her canal is stenotic at C3-

9    C4, C4-C5, and C6-C7." (TR. 392).  He noted that Plaintiff's "gait is myelopathic with

10   increased tone bilaterally but more so on the right than the left.  She has chronic cervicalgia."

11   (*Id.*; *see also* TR. 383 (Plaintiff "was discovered to have severe spinal stenosis from C3-C4

12   down to C6-C7, with the worse level being C5-C6.  She had signal change in her cord."). Dr.

13   Sanan recommended a multi-level laminectomy with arthrodesis.  (*Id.* (*see also* TR. 396

14   (referring to the procedure as "posterior cervical laminectomy from C3 to C7 and posterior

15   cervical fusion for decompression of the spinal canal and spinal cord.")).  He suspected that

16   Plaintiff may need additional surgery but he "hesitate[d] to perform a four-level anterior

17   cervical discectomy and arthrodesis because the risk of pseudoarthrosis is so high." (TR.

18   392).

19       A March 2007 MRI of Plaintiff's cervical spine showed multilevel cervical spinal

20   stenosis with cord deformity, most severe at C5-C6 where there was cord edema and minimal

21   pathologic contrast enhancement.  (TR. 368).  A March 2007 CT scan showed, among other

22   things, disc bulging/ridging with ventral cord contouring suspected at C4-C5, disc osteophyte

23   complex and left ventral cord contouring suspected at C3-C4, and multilevel foraminal

24   stenosis.  (TR. 369, 371).

25       Also in March, 2007, Jan R. Haskell, NP-C, from Dr. Sanan's office, wrote that due

26   to Plaintiff's diagnosis and upcoming surgery, Plaintiff was unable to participate in "the Jobs

27   program at this juncture."  (TR. 398).  This letter was "[d]ictated on behalf of..." Dr. Sanan.

28   (*Id.*).

1    On March 19, 2007, Plaintiff underwent "posterior cervical laminectomy from C3

2  through C6 with arthrodesis and lateral mass plates...performed by Dr. Sanan and Dr. Niteen

3  S. Andalkar. (TR. 385 (*see also* TR. 383-384 (the procedure involved application of lateral

4  mass screws and rod system from C3 to C6)). She was later discharged to a "skilled nursing

5  care facility" for occupational therapy and physical therapy for gait, ambulation and balance.

6  (TR. 385, 389, 399).

7    In April, 2007, Plaintiff reported to Dr. Sanan that "her arms feel better, her hands

8  have more dexterity, and her ambulation has improved." (TR. 399). Dr. Sanan noted that

9  Plaintiff "is still myelopathic with persistent hyperreflexia....Her hand function is quite good.

10  Her gait remains myelopathic." (*Id.*). He prescribed a walker for Plaintiff. (*Id.*).

11    April 2007 cervical spine x-rays showed no evidence of loosening of rods or screws.

12  (TR. 374). The films also showed "[s]light reversal of the normal lordotic curvature in the

13  lower cervical spine...with narrowing greatest at C6-7." (*Id.*).

14    On April 17, 2007, Dr. Sanan indicated that "[a]t the present time Ms. Mendenhall has

15  not been released from surgical care and it is recommended that she not resume any type of

16  employment activity at this juncture. Ms. Mendenhall has been informed to remain off work

17  until at least August 1, 2007. At that time she will be reevaluated." (TR. 404).

18    After a May 2007 examination of Plaintiff, Dr. Sanan indicated that Plaintiff was

19  "improved after surgery but she still has some residual symptoms. Her walking is definitely

20  improved. She used to have numbness essentially from the clavicle down and now she has

21  numbness in the distal extremities, both upper and lower...." (TR. 405). On physical

22  examination, Dr. Sanan found that Plaintiff had "hyperreflexia. She clearly ambulates much

23  better than she did prior to surgery, although she still finds it necessary to use a walker for

24  most of the day." (*Id.*). He noted that "[s]ome of her sensory complaints may be permanent.

25  She did have preexisting T2 signal change within the spinal cord and so it is unclear whether

26  she will regain complete function." (*Id.*).

27    In August 2007, Dr. Sanan found that Plaintiff's recent MRI "looks very good and I

28  do not see any significant compression remaining. She still has signal change at C5-C6 and

1   this is likely a permanent finding." (TR. 406; *see also* TR. 381-382).

2       In March 25, 2008, Plaintiff's treating physician, Dr. Wadleigh, wrote that Plaintiff

3   had undergone lumbar and cervical surgeries for laminectomy and suffered complications

4   with the cervical laminectomy. (TR. 323). He indicated that Plaintiff suffered from chronic

5   neck and low back pain but that further surgery is not indicated. (*Id.*). Dr. Wadleigh, further

6   stated that Plaintiff "will have difficulty attending her jobs program because of her current

7   medical condition." (*Id.*).

8       On August 8, 2008, Dr. Wadleigh expressed the same opinion as in his March 25,

9   2008 letter. (TR. 322 (also indicating that no further surgery is indicated and Plaintiff "is

10  going to treat...[her chronic neck and low back pain] medically.")).

11              a.       Analysis

12      Defendant argues that the ALJ "reasonably 'considered opinion evidence in

13  accordance with the requirements of 20 C.F.R. §416.927...'" and applicable Social Security

14  Rulings. (Defendant's Brief, p. 7 (*quoting* TR. 21)).

15      "Generally, the opinions of examining doctors are afforded more weight than those

16  of non-examining physicians, and the opinions of examining non-treating physicians are

17  afforded less weight than those of treating physicians." *Orn v. Astrue,* 495 F.3d 625, 631 (9[th]

18  Cir. 2007) (*citing* 20 C.F.R. §404.1527(d)(1)(2)); *see also* 20 C.F.R. §416.927(d)(1)-(2)).

19      Here, with regard to Plaintiff's physical limitations, the ALJ gave "limited weight"

20  to the limitations recommended by examining Dr. Soo Hoo in 2004 and 2005 "since I find

21  that the claimant has the physical capacity for light work without additional limitations

22  enumerated..." by Dr. Soo Hoo.    (TR. 23). Likewise, she gave limited wight to non-

23  examining Dr. Hirsch's opinion that Plaintiff could perform limited light work, "since the

24  undersigned finds that the claimant has the physical capacity for light work with the ability

25  to stand/walk 6 hours in an 8 hour workday." (TR. 24). Thus, the ALJ rejected Dr. Soo

26  Hoo's and Dr. Hirsch's opinions that Plaintiff, among other things, was limited to 4 hours

27  in an 8-hour workday with regard to standing and/or walking. The ALJ gave "great weight"

28  to the opinion of non-examining Dr. Fina, who opined that Plaintiff was capable of the "full

range of light work with occasional climbing of ladders, ropes and scaffolds", because the ALJ found Dr. Fina's opinion to be "consistent with the overall evidence...."  (TR. 24). Further, although Drs. Soo Hoo, Hirsch, and Fina recommended limitations with regard to climbing in certain instances, the ALJ found no restrictions on climbing although she provided no reason for this conclusion.

A nonexamining physician has neither examined nor treated the plaintiff.  *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995).  "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining or a treating physician."  *Id.* at 831.  However, the "'ALJ may reject the testimony of an examining, but non-treating physician, in favor of a nonexamining, nontreating physician when [s]he gives specific, legitimate reasons for doing so, and those reasons are supported by substantial record evidence.'" *Id.* (*quoting Roberts v. Shalala,* 66 F.3d 179, 184 (9th Cir. 1995) (emphasis omitted)). The ALJ satisfies this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating h[er] interpretation thereof and making findings." *Magallanes,* 881 F.2d at 751 (quotation marks and citation omitted).  Thus, "[t]he ALJ must do more than offer h[er] own conclusions. [Sh]e must set forth [her] own interpretations and explain why they, rather than the doctors' are correct." *Orn,* 495 F.3d at 632 (*citing Embrey v. Bowen,* 849 F.2d 418, 421-22 (9th Cir. 1988)).  Although the ALJ herein set out a detailed summary of the medical record, the decision is devoid of any explanation to support her ultimate decision to adopt non-examining Dr. Fina's recommendation of light work over examining Dr. Soo Hoo's and non-examining Dr. Hirsch's recommendations of limited light work.[3]  Instead, the ALJ provided nothing more than her own conclusion.  On the instant record, the ALJ has failed to set forth specific and legitimate reasons supported by substantial evidence for her finding that Plaintiff "has the physical capacity for light work..." in that Plaintiff could stand and/or walk for 6

---

[3]In this instance, limited light work refers to Dr. Soo Hoo's and Dr. Hirsch's findings that Plaintiff could stand and/or walk up to 4 hours in an 8 hour workday and that Plaintiff had postural limitations.

hours in an 8 hour workday and that Plaintiff had no postural limitations.  (*See* TR. 21, 24).

The ALJ's evaluation of the medical record is also troubling with regard to Plaintiff's post-surgical condition.  Defendant opines that Plaintiff's March 2007 cervical laminectomy at C3-C6, which involved surgical fusion and the application of screws and a rod, "alleviated" Plaintiff's condition.  (Defendant's Brief, p. 8).  For support, Defendant relies on Dr. Sanan's 2007  notes that Plaintiff: (1) "ambulated much better than she did prior to the surgery, although she was still using a walker [prescribed by Dr. Sanan (*see* TR. 399)], for most of the day"...; and (2) an August 2007 MRI showing that the surgery "had relieved the severe central stenosis at the C5-[C]6 level."  (*Id.* (*citing* TR. 381, 405)).[4]  The record also reflects that in May 2007, Dr. Sanan opined that due to signal change in the spinal cord, "[s]ome of...[Plaintiff's] sensory complaints may be permanent" and that it was unclear whether she would regain "complete function."  (TR. 405).  In his last treatment note, dated August 2007, Dr. Sanan indicated that Plaintiff's MRI looked good and he did not see any significant compression remaining, although he noted signal changes at C5-C6, which was "likely a permanent finding."  (TR. 406).

Although the plaintiff bears the ultimate burden to establish she is disabled, *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001) (*citing* 42 U.S.C. § 423(d)(5)), the ALJ in a social security case nonetheless has an independent "duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir.1983). When the claimant is not represented by counsel, as in the instant case, "it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire

---

[4]In summarizing Dr. Sanan's treatment notes post-surgery, the ALJ indicated, in pertinent part:

> Dr. Sanan stated that *she had improved after surgery*, but still had some residual symptoms.  The *claimant ambulated much better than she did prior to the surgery,* although she found it necessary to use a walker for most of the day....The *laminectomy had relieved the severe central stenosis at the C5-6 level.*

(TR. 17) (emphasis in original).  However, the ALJ does not state that she afforded any weight to Dr. Sanan's findings.

1   of, and explore for all relevant facts", and she must be "especially diligent in ensuring that

2   favorable as well as unfavorable facts and circumstances are elicited." *Cox v. Califano*, 587

3   F.2d 988, 991 (9th Cir.1978) (quotation marks and citation omitted);  *see also  Vidal v.*

4   *Harris*, 637 F.2d 710, 713 (9th Cir.1981)(same); *Crane v. Shalala*, 76 F.3d 251, 255 (9th Cir.

5   1996) (the ALJ has a duty to develop the record even when the claimant is represented).  The

6   "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence

7   or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes*, 276

8   F.3d at 459–460.  The ALJ can develop the record by (1) making a reasonable attempt to

9   obtain medical evidence from the claimant's treating sources, (2) ordering a consultative

10  examination when the medical evidence is incomplete or unclear and undermines the ability

11  to resolve the disability issue; (3) subpoenaing or submitting questions to the claimant's

12  physicians; (4) continuing the hearing; or (5) keeping the record open for supplementation.

13  *See Tonapetyan v. Halter*, 242 F.3d. 1144, 1150 (9th Cir. 2001); 20 C.F.R. § 416.917; 42

14  U.S.C. § 423(d)(5)(A), (B).

15       Post-surgery, Dr. Sanan prescribed a walker for Plaintiff.  Post-surgery, Dr. Sanan

16  indicated that Plaintiff's sensory complaints may be permanent.  Post-surgery, Plaintiff had

17  to adapt to having "lateral mass screws and a rod system from C3 to C6...." (TR. 383). It is

18  not clear on the record that Plaintiff's post-surgical limitations, if any, were the same as,

19  worse than, or improved from those assessed pre-surgery by Dr. Fina, whose opinion the ALJ

20  accorded great weight, or Drs. Hirsch and Soo Hoo.  There is no evidence in the record to

21  conclude that the limitations assessed pre-2007 remain unchanged post-surgery. Although

22  the Appeals Counsel remanded the matter to the ALJ for consideration of evidence relating

23  to Plaintiff's surgery including a consultative examination if warranted, (TR. 68), the record

24  is devoid of any assessment from a medical source of Plaintiff's physical residual functional

25  capacity post-surgery.  The instant record does not contain adequate medical information

26  from which the ALJ could possibly assess Plaintiff's post-surgical physical residual

27  functional capacity.  Further, in assessing Plaintiff's pre-surgical condition, the ALJ did not

28  specifically consider that Plaintiff's  condition was such that surgery and the application of

1   a rod and screws to her cervical spine was required.  Additionally, it may well be that the

2   2007 MRIs and CT scans, in addition to other records, will also be informative as to

3   Plaintiff's pre-2007 condition.  *Flaten v. Secretary,* 44 F.3d 1453, 1461 n.5 (9th Cir. 1995)

4   (retrospective diagnosis may be used to determine disability onset); *Smith v. Bowen,* 849 F.2d

5   1222, 1225 (9th Cir. 1988) (same).  Under the instant circumstances, further development of

6   the record is necessary.

7           Moreover, further development of the record may also require reassessment of treating

8   Dr. Wadleigh's 2008 opinions of record.  The ALJ gave "[l]ittle weight" to Dr. Wadleigh's

9   2008 opinion that Plaintiff would "have difficulty attending her jobs program because of her

10   current medical condition" which included "chronic pain of both her neck and low back."

11   (TR. 22, 323; *see also* TR. 322).  The ALJ did so because Dr. Wadleigh's "letters are

12   inconsistent with the treating notes."  (TR. 22).  After Dr. Sanan's August 2007 note, there

13   is scant information in the record concerning Plaintiff's medical treatment until Dr.

14   Wadleigh's 2008 letters.  Hence, it is unclear what "treating notes" are inconsistent with Dr.

15   Wadleigh's 2008 opinion.   Although at present, the medical record, alone, does not

16   substantially support Dr. Wadleigh's 2008 opinions, Dr. Wadleigh's opinion in March 25,

17   2008 and August 8, 2008 that Plaintiff suffered from chronic neck and back pain and that her

18   medical condition prevented her from attending her jobs program should be reconsidered in

19   light of further development of the record consistent with this Order.[5]

20   _____

21           [5]Plaintiff attached to her Reply a 2010 "Treating Physician's Functional Capacity

22   Report" completed by Dr. Wadleigh, who indicated that Plaintiff: is unable to work for at
    least 12 months; must vary sitting, standing and walking; is limited with regard to pulling,

23   climbing, bending, kneeling, and reaching; and also has restrictions with regard to exposure
    to extreme heat and cold.  Plaintiff also attached to her Reply a 2011 "Chronic Pain Medicine

24   Treatment Plan" signed by herself and Dr. Wadleigh.  Generally, when determining whether
    to remand a matter in light of new evidence, the court must examine whether: (1) the new

25   evidence is material to a disability finding and (2) Plaintiff has shown good cause for having

26   failed to present the new evidence to the ALJ earlier. *See Mayes,* 276 F.3d at 462; *Booz v.
    Secretary of Health & Human Servs.,* 734 F.2d 1378, 1389 (9th Cir. 1974).  Dr. Wadleigh's

27   2010 Functional Capacity Report bears directly and substantially on the matter in dispute.

28   Although Plaintiff has not stated good cause for her failure to produce the evidence earlier,

1

2.     Effects of symptoms

2     The ALJ, in arriving at her RFC assessment, found that Plaintiff's "allegations of

3     severe pain limiting her ability to perform substantial gainful activity are not fully credible."

4     (TR. 22). When assessing a claimant's credibility, the "ALJ is not required to believe every

5     allegation of disabling pain or other non-exertional impairment."   *Orn,* 495 F.3d at 635

6     (internal quotation marks and citation omitted). However, where, as here, the claimant has

7     produced objective medical evidence of an underlying impairment that could reasonably give

8     rise to the symptoms and there is no affirmative finding of malingering by the ALJ, the ALJ's

9     reasons for rejecting the claimant's symptom testimony must be specific, clear and

10    convincing.   *Tommasetti v. Astrue*, 533 F.3d 1035 (9th Cir. 2008); *Orn,* 495 F.3d at 635*;*

11    *Robbins,* 466 F.3d at 883.  Additionally, "[t]he ALJ must state specifically which symptom

12    testimony is not credible and what facts in the record lead to that conclusion." *Smolen v.*

13    *Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn,* 495 F.3d at 635 (the ALJ must

14    provide specific and cogent reasons for the disbelief and cite the reasons why the testimony

15    is unpersuasive). In assessing the claimant's credibility, the ALJ may consider ordinary

16    techniques of credibility evaluation, such as the claimant's reputation for lying, prior

17    inconsistent statements about the symptoms, and other testimony from the claimant that

18    appears less than candid; unexplained or inadequately explained failure to seek or follow a

19    prescribed course of treatment; the claimant's daily activities; the claimant's work record;

20    observations of treating and examining physicians and other third parties; precipitating and

21

22    the Report is consistent with Dr. Wadleigh's 2008 opinions of record and neither  record

23    existed prior to the ALJ's ruling.  This is not a case where Plaintiff, having failed to succeed

24    on her disability claim sought out a new expert. *See e.g., Key v. Heckler,* 754 F.2d 1545,

1551 (9th Cir. 1985).  Instead, Plaintiff attempts to provide additional information in the form

25    of a post-surgical functional assessment from her treating physician–an inquiry the ALJ

26    should have made of Plaintiff's physicians and/or a consultant, but did not.  The Court has

already determined that further development of the record is necessary, therefore, the Court

27    need not determine whether remand is necessary by virtue of the records Plaintiff attached

to her Reply.  In further developing the record, the ALJ may consider the records from Dr.

28    Wadleigh attached to Plaintiff's Reply.

1   aggravating factors; and  functional restrictions caused by the symptoms. *Lingenfelter v.*

2   *Astrue,* 504 F.3d 1028, 1040 (9ᵗʰ Cir. 2007); *Smolen,* 80 F.3d at 1284. *See also Robbins,* 466

3   F.3d at 884 ("To find the claimant not credible, the ALJ must rely either on reasons unrelated

4   to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his

5   testimony and his own conduct; or on internal contradictions in that testimony.").

6       At Plaintiff's 2006 hearing, which occurred before her surgery, Plaintiff testified that

7   35 years had passed since she last worked and she received disability benefits beginning in

8   the late 1990's for "the same problems I have now."  (TR. 417).  Five days before the

9   hearing, Plaintiff began to experience numbness in her whole body. (TR. 419, 421).  Plaintiff

10  has constant pain in her neck and back causing her to be unable to stand or sit for very long;

11  instead she must change positions.  (TR. 423).  "The more activity that I do during the day,

12  the next day it will be more pain."  (*Id.*).  Plaintiff testified that she can walk only a block and

13  she can  stand for only 15-20 minutes.  (*Id.*).  Whether she is sitting or standing,  she "feels

14  like there's [sic] bricks on my shoulders..., like it's just compacting my body down." (*Id.*).

15  Plaintiff rates her pain at an eight.  (TR. 424).  A year before, she would have rated it at ten.

16  (*Id.*).  Plaintiff appeared at the hearing in a wheelchair which she has used "periodically for

17  years."  (TR. 421).

18      Plaintiff also suffers from carpel tunnel syndrome and the middle finger on her left

19  hand "get[s] stuck...."  (TR. 422).  Plaintiff wears splints at night.  (*Id.*).  Plaintiff is also

20  receiving treatment for her bipolar disorder.  (TR. 426).  Plaintiff takes Vicodin, Seroquel,

21  Trazodone, and Prozac with no side effects.  (*Id.*).

22      Plaintiff is separated from her husband and is the mother of eight children ranging in

23  age from 12 to 27.  (TR. 414-415). On a typical day, Plaintiff arises at approximately 6:00

24  a.m., makes coffee and wakes her children for school.  (TR. 427-428).  Plaintiff cooks and

25  cares for her family "as best..." as she can despite her pain. (TR. 147, 426-427).   After the

26  children go to school, Plaintiff rests, watches television or sleeps for the rest of the day. (TR.

27  427).  Plaintiff sometimes starts laundry, but her daughters will hang up the wash.  (*Id.*).

28  Plaintiff is unable to shower by herself, and requires her daughter to help her wash her hair

"because I can't feel myself", but this has only been during the last few days.  (TR. 428).

Before her mother's death, Plaintiff accompanied her to dialysis appointments and she would give her mother sponge baths, change her mother's diapers and provide other care. (TR. 429-430).  Plaintiff's daughters also "help[ed] with everything that...needed to be done."  (TR. 430).  Plaintiff's daughters testified that they helped Plaintiff with household chores because Plaintiff is in a lot of pain and is unable to stand.  (TR. 431, 433).

At the September 2008 hearing, Plaintiff testified that the 2007 cervical laminectomy resulted in removal of "all six of my bones in the back of my neck and replace[d] it [sic] with titanium rods.  I can't look up high, down low, or all the way to each side of my head.  I am in constant pain.  I am on morphine and Vicodin."  (TR. 440; *see also* TR. 454 (Plaintiff's daughter testified that Plaintiff "can't...move her head around too much because she has that metal bar.  So I help out a lot at home.")).[6]  Plaintiff and her daughters testified that Plaintiff is unable to stand for more than a short time and she has difficulty raising her arms to reach for things or to brush and wash her hair.  (TR.  446-447, 451-452, 454).  Although Plaintiff attended the hearing without the use of a cane, walker, or wheelchair, her daughters testified that Plaintiff uses a wheelchair cart when grocery shopping, and she uses a wheelchair when going places where she will be required to stand for a long time or where she will need to "walk...up....."  (TR. 456-457; *see also* TR, 451).  Plaintiff does not drive.  (TR. 441).  She tries to help out at home by doing dishes, but she must sit and it takes her a long time to complete the task.  (TR. 446, 454).  Plaintiff also testified that she experiences hand

---

[6]The ALJ clarified as follows:

Q. [ALJ]:      Can you move your eyes up and down and to the side?
A. [Plaintiff]: Yes
Q.                 It's your head that you can't move, correct?
A.                 Right.  I can [sic] move it.
Q.                 So you do have some ability to look up, down, and to the side?
A.                 Yes.

(TR. 441).  According to the VE, there would be no sedentary jobs or light, unskilled jobs that a person could do if the person had a limited ability to move his or her head down.  (TR. 462-463).

numbness.  (TR. 450; *see also* (TR. 451-452 (Plaintiff's daughter testified that Plaintiff has difficulty using her hands)).

<u>a.     Analysis</u>

In discounting Plaintiff's credibility, the ALJ stated that "[t]he medical records do not support limitations testified by the claimant and her daughter [sic]."[7]  (TR. 22).  Medical records post-surgery reflect Dr. Sanan's note that although Plaintiff's ambulation had improved, she still found it necessary "most of the day" to use the walker he had prescribed. (TR. 399, 405).  He initially noted in April 2007 that Plaintiff's hand function was "quite good" and, in May 2007, he noted that "[s]he used to have numbness essentially from the clavicle down and now she has numbness in the distal extremities, both upper and lower extremities." (TR. 399, 405).  Dr. Sanan also opined that Plaintiff's sensory complaints may be permanent and it was unclear whether she would regain complete function.  (TR. 405; *see also* TR. 406).  There is nothing in the record to assess the impact on head movement caused by the rod and screws implanted in Plaintiff's spine.  Yet, the record strongly suggests that if Plaintiff had a limited ability to move her head down, no jobs would be available to her. (*See* TR. 462-463).  Until the record is fully developed with regard to Plaintiff's condition post-surgery, *see supra,* at IV.B.1.a., assessment of Plaintiff's credibility in light of the medical record is impossible.

The ALJ also discounted Plaintiff's credibility because Plaintiff had received "AFDC for 30 years.  She also received social security benefits until her incarceration.  I find that there is an absence of motivation to work that diminishes claimant's credibility." (TR. 23). An ALJ may draw reasonable inferences regarding a claimant's motivation to work. *Tommasetti*, 533 F.3d at 1040.  However, it is not reasonable to conclude that because Plaintiff qualified for and has received AFDC and has not worked in the past having been found disabled under the Social Security Act, she is not a credible witness as to her own symptoms and ability to work.

---

[7]Two of Plaintiff's daughters testified at both hearings before the ALJ.

1    The ALJ further pointed out that Plaintiff's "medical regimen includes only

2  conservative and symptomatic treatment rather than aggressive medical treatment." (TR. 22).

3  The ALJ's statement overlooks the fact that Plaintiff underwent cervical laminectomy. This

4  consideration is best reassessed after the record has been further developed.

5    Additionally, the ALJ found Plaintiff lacked credibility because Plaintiff was able to

6  "engage[] in a significant range of activities of daily living." (TR. 22). The ALJ cited

7  Plaintiff's 2006 hearing testimony that she woke at 6:00 a.m., got her children off to school,

8  and slept until they returned home. (TR. 22). The ALJ further pointed out that Plaintiff

9  "watches television, occasionally cooks, does laundry on occasion with help from her

10  daughters and helps her children with their homework. Claimant stated that she does not

11  shop. She was the caregiver for her mother and performed chores including attending dialysis

12  treatments, helping sponge bathe her mom and changing diapers. Until about five days

13  before the hearing, claimant was able to dress and shower independently but has since

14  required the assistance of her daughter to complete personal care." (TR. 22-23). At the 2006

15  hearing, Plaintiff testified that although she sometimes did the laundry, her children would

16  hang it up and that "some days are better than other days...." (TR. 427-428). Plaintiff also

17  testified that her daughters helped her to care for her ailing mother. (TR. 430). Although

18  Plaintiff testified in 2006 that she only recently began to experience numbness causing her

19  to require help with personal care, the ALJ overlooked Plaintiff's and the other witnesses'

20  testimony almost two years later in 2008 that Plaintiff still required such assistance. (TR.

21  446-447, 451-452, 454). Further, testimony at the 2008 hearing was that Plaintiff cooks and

22  does dishes while sitting. (TR. 451, 454).

23    The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried

24  on certain daily activities such as grocery shopping, driving a car, or limited walking for

25  exercise, does not in any way detract from her credibility as to her overall disability. One

26  does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter,* 260

27  F.3d 1044, 1050 (9th Cir. 2001) (*quoting Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989));

28  *see also Fair,* 885 F.2d at 603 ("[M]any home activities are not easily transferable to what

1   may be the more grueling environment of the work place...."); *Vick v. Commissioner of the*

2   *Social Security Admin.*, 57 F.Supp.2d 1077, 1086 (D. Or. 1999) ("[i]f claimant's activity is

3   in harmony with her disability, the activity does not necessarily indicate an ability to work.").

4   The question is whether the plaintiff spends a "'*substantial* part of h[er] day engaged in

5   pursuits involving the performance of physical functions that are transferrable to a work

6   setting....' Thus, if a claimant is capable of performing activities including household chores,

7   'that involve many of the same physical tasks as a particular type of job, it would not be

8   farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from

9   working.'"   *Vick,* 57 F.Supp.2d at 1085-86 (*quoting Fair,* 885 F.2d at 602)(emphasis in

10  original); *see also Morgan v. Commissioner of Social Sec. Admin.,* 169 F.3d 595, 600 (9th

11  Cir. 1999) (same).   On the instant record, the ALJ's reliance  on Plaintiff's 2006 activities,

12  in and of itself, does not constitute clear and convincing evidence that Plaintiff is not to be

13  believed.   Further, that Plaintiff is able to carry on the activities she does post-surgery, is not

14  inconsistent with limitations on head movement caused from insertion of the rod during the

15  2007 surgery.   *See Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir. 1993) (when rejecting a

16  Plaintiff's credibility, it is "not sufficient for the ALJ to make only general findings; he must

17  state which pain testimony is not credible and what evidence suggests the complaints are not

18  credible.   He must either accept [claimant's] testimony or make specific findings rejecting

19  it." (internal quotation marks and citation omitted)); *Smolen*, 80 F.3d at 1284 (same).

20          3.      Conclusion

21          For the foregoing reasons, the ALJ failed to set out specific and legitimate reasons to

22  reject the examining doctor's pre-surgical opinions as to Plaintiff's physical limitations.

23  Thus, the ALJ erroneously relied on the opinion of non-examining Dr. Fina to arrive at her

24  RFC assessment.   Additionally, further development of the record is necessary to determine

25  Plaintiff's post-surgical RFC.   Further development of the record may also affect the

26  disability determination with regard to Plaintiff's pre-surgical condition and limitations.

27  Additionally,  not all of the reasons cited by the ALJ for discounting Plaintiff's subjective

28  complaints are supported by clear and convincing evidence.   As to other reasons cited by the

ALJ to discredit Plaintiff's symptom testimony, further development of the medical record is necessary.

### C.    VE Testimony

In concluding that Plaintiff was not disabled under the Act, the ALJ relied on the VE's response to the following hypothetical question:

> assume that we have a hypothetical individual with the same age, education, and vocational background as the Claimant and assume, that these are the limitations[:] may lift up to 20 pounds occasionally, 10 pounds frequently, that includes carrying, [sic] same; stand and/or walk six hours in [sic] eight hour day, and limited to simple, repetitive tasks.  With those limitations and no others, what jobs, if any, are available to this hypothetical individual?

(TR. 460; *see also* TR. 25).  Defendant asserts that "[s]ince the ALJ provided the VE with a hypothetical that incorporated all of Plaintiff's credible limitations, the ALJ was entitled to rely on the VE's response to the hypothetical." (Defendant's Brief, p. 11 (*citing Valentine v. Commissioner,* 574 F.3d 685, 690 (9th Cir. 2009))).  The ALJ's hypothetical question posed to the VE must "include *all* of the claimant's functional limitations, both physical and mental." *Flores v. Shalala,* 49 F.3d 562, 570 (9th Cir. 1995) (emphasis added).  *See also Valentine,* 574 F.3d at 690.

As discussed above, the record requires further development with regard to Plaintiff's physical limitations.  With regard to Plaintiff's mental limitations, Plaintiff presented at a local crisis center in August 2005 requesting "help with meds", which were about to run out, and explaining that she had recently been released from prison.  (TR. 186; *see also* TR. 200(medications included Prozac, Seroquel and Trazodone also noting that Plaintiff took Zoloft for 9-10 years before going to prison)).  Plaintiff reported "she has felt fairly stable" on the medication.  (TR. 200).  She also indicated that she sometimes heard voices, however, medication helped with this. (*Id.*)  Plaintiff described periods of crying daily, sleeping little, confusion and "cleaning all the time." (TR. 180).  She also described visual hallucinations of  "short black things." (*Id.*)  Plaintiff also felt that people could read her thoughts and wanted to harm her. (*Id.*).  Plaintiff's August 2005 mental status exam reflected that: she was oriented to person, place, time and situation; her speech was coherent; her affect was

1    appropriate; her thought process was logical; her judgment and insight were good; her eye

2    contact and behavior was appropriate; and her mood was depressed.  (TR. 182).  The treating

3    psychiatrist diagnosed "[b]ipolar disorder type I [with] psychotic [features], R[ule]/o[ut]

4    schizophrenia, and panic [disorder with] agorophobia [sic]."  (TR. 183).  Plaintiff's Global

5    Assessment of Functioning score was 35.  (*Id.*).  Resperidone, Seroquel, Trazadone and

6    Prozac were prescribed.  (*Id.*).

7        Thereafter, Plaintiff sought treatment and medication refills from CODAC Behavioral

8    Health, Services.  In September 2005, Plaintiff reported difficulty getting her Prozac filled.

9    (TR. 237). She appeared unkempt, tired, disheveled, and her affect was anxious and irritable.

10   (*Id.*).  Her mood was depressed but her thought process was organized.  (*Id.*). Plaintiff missed

11   appointments for treatment at CODAC in January, February and March 2006.  (TR. 232, 305,

12   307).  In May 2006, Plaintiff reported that she had been off her medication for one month and

13   that she had missed her previous appointments because she had been caring for her mother

14   who passed away in March 2006.  (TR. 304).  On May 4, 2006, Plaintiff saw Ann Curry,

15   PAC, who noted that Plaintiff: was tearful and depressed regarding her mother's death; was

16   talkative and non-delusional; and had poor insight.  (TR. 303).  In June 2006, PAC Curry

17   noted that Plaintiff felt frustrated, was anxious, and her thought process was clear.  (TR.

18   302).  In August 2006, Plaintiff reported that she was tired, having "some 'night terrors'

19   related to..." her mother's death. (TR. 301).  PAC Curry indicated that Plaintiff's appearance

20   was unkempt, which was "usual", and her insight and judgment were poor to fair.  (*Id.*).

21       In February 2006, Plaintiff was examined by state agency licensed psychologist

22   Nicole Rohen, Ph.D.  (TR. 253-256).  Dr. Rohen's diagnosis was "Bipolar Disorder

23   NOS...R/O P[ost] T[raumatic] S[tress] D[isorder]."  (TR. 255).  Dr. Rohen noted that

24   Plaintiff "appears rapid-cycling and it is unclear whether she has ever met the duration

25   criteria for Bipolar I or II disorders.  It is also unclear to what extent this has impacted her

26   ability to work in the past, as claimant was primarily a homemaker and has little outside work

27   history to inform this judgment."  (TR. 256).

28       Based on her testing and examination of Plaintiff, Dr. Rohen opined that Plaintiff was

1  not limited and/or mildly limited in the area of understanding, carrying out, and

2  remembering. (TR. 257-256). In the area of sustained concentration and persistence Plaintiff

3  was: not limited in the ability to carry out very short and simple instructions; mildly limited

4  in the ability to carry out detailed instructions and to make simple work related decisions; and

5  moderately limited in her ability to maintain attention and concentration for extended

6  periods, to perform activities within a schedule, maintain regular attendance, and be punctual

7  with customary tolerances, sustain an ordinary routine without special supervision,  to work

8  in coordination with or proximity to others without being distracted by them, and in the

9  ability to complete a normal workday and workweek without interruptions from

10  psychologically based symptoms and to perform at a consistent pace without an unreasonable

11  number and length of rest periods. (TR. 258-259). In the area of social interaction, Plaintiff

12  was: mildly limited in the ability to ask simple questions or request assistance and to

13  maintain socially appropriate behavior and to adhere to basic standards of neatness and

14  cleanliness; and moderately limited in the ability to interact appropriately with the general

15  public, accept instructions and respond appropriately to criticism from supervisors, and  get

16  along with co-workers or peers (TR. 260). In the area of adaptation, Plaintiff was: mildly

17  limited in the ability to respond appropriately to changes in the work setting, to be aware of

18  normal hazards and take appropriate precautions, to travel in unfamiliar places and use public

19  transportation; and moderately limited in the ability to set realistic goals or make plans

20  independently of others. (TR. 261). Dr. Rohen further opined that Plaintiff's "[p]rognosis

21  for continued stability is considered fair." (TR. 256).

22        In March 2006, non-examining state agency psychologist, Paul Tangeman Ph.D.

23  assessed Plaintiff. (TR. 263-279). He diagnosed Plaintiff with "[b]ipolar syndrome with a

24  history of episodic periods manifested by the full symptomatic picture of both manic and

25  depressive syndromes (and currently characterized by either or both syndromes)." (TR. 270).

26  He opined that Plaintiff was not significantly limited in understanding and memory and she

27  was moderately limited in the ability to: carry out detailed instructions; complete a normal

28  workday and work week without interruptions from psychologically based symptoms and to

1   perform at a consistent pace; interact appropriately with the general public; accept

2   instructions and respond appropriately to criticism from supervisors; and maintain socially

3   appropriate behavior and adhere to basic standards of neatness.  (TR. 263-264).  In sum, he

4   found that Plaintiff had: mild restriction of activities of daily living; mild to moderate

5   difficulties in maintaining social functioning; and mild to moderate difficulties in maintaining

6   concentration, persistence or pace.  (TR. 277).   Dr. Tangeman opined that Plaintiff was

7   independent in activities of daily living and she would be "capable of simple work tasks

8   [with] few social demands...."  (TR. 265).

9        Herein, the ALJ gave "great weight" to Dr. Tangeman's opinion.  Although Dr.

10  Rohen, like Dr. Tangeman, also indicated that Plaintiff had moderate difficulty with social

11  interaction (*see* TR. 260), the ALJ, without stating any reason why, gave significant weight

12  to Dr. Rohen's opinion only "to the extent that it limits the claimant to simple, repetitive

13  tasks."  (TR. 24).   However, the ALJ also found that Plaintiff had "mild to moderate

14  difficulties maintaining social functioning" as well as "mild to moderate restrictions in

15  concentration, persistence or pace."  (TR. 20).

16       With regard to mental limitations, the hypothetical question the ALJ posed to the VE

17  limited Plaintiff to "simple, repetitive tasks."   (TR. 460).   "[A]n ALJ's assessment of a

18  claimant adequately captures restrictions related to concentration, persistence, or pace where

19  the assessment is consistent with restrictions identified in the medical testimony." *Stubbs-*

20  *Danielson v. Astrue,* 539 F.3d 1169, 1174 (9th Cir. 2008).  Given Dr. Tangeman's opinion

21  that Plaintiff was capable of performing simple work despite mild to moderate limitations in

22  the area of concentration, persistence or pace, it is arguable that the ALJ's hypothetical

23  question limiting Plaintiff to simple, repetitive tasks sufficiently accounted for Plaintiff's

24  limitations in this area. *Compare id.* (*discussing Howard v. Massanari,* 255 F.3d 577, 582

25  (8th Cir. 2001) wherein the ALJ's hypothetical question describing the claimant as able to do

26  simple repetitive work was adequate because medical testimony was that the claimant,

27  despite certain pace deficiencies, retained the ability to do simple, repetitive, routine tasks);

28  *with  Brink v. Commissioner*, 343 Fed.Appx. 211 (9th Cir. 2009); *Berjettej v. Astrue,*2010

WL 3056799, *7-*8 (D.Or. July 30, 2010).  However, the hypothetical question posed in the instant case did not include Dr. Tangeman's opinion that Plaintiff required "few" social demands, nor the ALJ's own finding that Plaintiff had difficulties in social functioning. Consequently, the question which the VE answered did not include all of Plaintiff's limitations as found by the ALJ and, in turn, the  ALJ's reliance on the VE's answer to such question was erroneous.  *See Embrey,* 849 F.2d at 423 ("Because the hypothetical posed by the ALJ to the vocational expert did not reflect all of [plaintiff's] limitations, the expert's opinion has no evidentiary value and cannot support the ALJ's decision.") (footnote omitted).

## V.    CONCLUSION

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'"  *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985))."  Remand for further administrative proceedings is appropriate if enhancement of the record would be useful.  *Benecke v. Barnhart ,* 379 F.3d 587,  593 (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)).   Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.* (citations omitted).  Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits."  *Id*. (citations omitted); *see also Lester,* 81 F.3d at  834.

Even if the pre-surgical limitations assessed by Dr. Soo Hoo were credited, it is not clear on the instant record whether Plaintiff would be found disabled.  Moreover, additional development of the record is required regarding Plaintiff's post-surgical limitations and such information may also impact assessment of Plaintiff's pre-surgical limitations.  Thus, there are outstanding issues that must be resolved before a disability determination can be made. The Court is well aware that  "[remanding a disability claim for further proceedings can

1   delay much needed income for claimants who are unable to work and are entitled to benefits,

2   often subjecting them to 'tremendous financial difficulties while awaiting the outcome of

3   their appeals and proceedings on remand.'" *Benecke,* 379 F.3d at 595 (*quoting Varney v.*

4   *Secretary of Health and Human Services,* 859 F.2d 1396, 1398 (9th Cir. 1988)).  Plaintiff

5   filed the instant application in 2005 and the  matter has already been remanded once by the

6   Commissioner. The Court is sympathetic to Plaintiff's situation.[8] Nonetheless, remand is the

7   only appropriate recourse on the instant circumstances.

8          Accordingly, for the foregoing reasons, IT IS ORDERED that this matter is

9   REMANDED to the Commissioner for further proceedings.  Alternatively, the Commissioner

10  may decide to forego further development of the record and, instead, award benefits. *See*

11  *McAllister v. Sullivan,* 888 F.2d 599, 604 (9th Cir. 1989).

12         The Clerk of Court is directed to enter judgement accordingly and close this case.

13         DATED this 15th day of March, 2012.

14

15  _____

16                  Héctor C. Estrada
                United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27         [8]Plaintiff has submitted a letter indicating that she is "soon to be homeless and have

28  no medical anymore."  (Doc. 21).